IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION



APR 13 2010

ROBERT D. MILKS, JR.,                )
                                     )
            Plaintiff,               )    CIVIL ACTION FILE
v.                                   )
                                     )    NUMBER 1:10-cv-236-TCB
SOFTWARE AG USA, INC.,               )
                                     )
            Defendant.               )

## O R D E R

Before the Court is Defendant Software AG USA, Inc.'s motion to dismiss [3] Plaintiff Robert D. Milks, Jr.'s complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## I. Background[1]

On March 9, 2009, Software AG hired Milks to serve as a regional sales manager for the southeast region of the United States. Milks's compensation was set forth in Software AG's "RSM Sales Commission Plan 2009 v1.1," which was signed by Milks and effective from the date of

---

[1] Because the case is before the Court on a motion to dismiss, the Court takes the factual allegations of the complaint as true. *Hunnings v. Texaco, Inc.,* 29 F.3d 1480, 1484 (11th Cir. 1994).

execution until December 31, 2009. The plan was comprised of three related documents: (1) terms and conditions of RSM sales commission plan 2009 v1.1, (2) Appendix A – Quote and commission rates v1.1, and (3) Appendix B – General employment terms USA 2009 commission plan v1.1.

Appendix A to the plan set forth the specific formula for determining Milks's compensation. Milks had a base salary of $110,000 and deferred commission compensation of varying percents depending on the type of sale made and the percentage of sales quota met. The commission rates relevant to this dispute arise from the sales of enterprise license agreements, extended rights management, and upgrade licenses (collectively, "ELA/ERM"). Milks was entitled to 2.34% on $750,000 of ELA/ERM sales, 3.03% on the next $375,00 of such sales, 3.30% on the next $375,000, and 3.44% on any additional amounts over his $1.5 million quota.

After Milks was hired and had signed the plan, he worked on an ELA/ERM deal involving Delta Air Lines, Inc. Software AG initially projected the deal to be valued at $1 million to $1.5 million, later increased the value to $2.5 million, and finally closed the deal in June 2009 at $5.6

million. The deal was approved in accordance with the plan, thereby entitling Milks to a commission for his work on the deal.

Milks contends that according to the formula established in Appendix A, he was owed a $181,573 commission from the deal. He alleges that prior to the closing of the deal, his direct supervisor and sales vice president, Mike McDonald, confirmed Milks's entitlement to a commission calculated at a $5 million deal value. Milks was also entitled to a second quarter 2009 sales bonus of 25%, which equaled $45,393. Thus, Milks asserts that as of July 31, 2009, he was owed $226,966 for commissions arising from the deal and his second quarter bonus.

On August 14, 2009, Software AG paid Milks $130,947 in commissions arising from the deal and the second quarter bonus. Milks avers that this payment was $96,019 less than he was owed.

Appendix B of the plan states in the section labeled "Interpretations and Disputes" that

> Any questions of interpretation or disputes regarding terms of the Plan should be escalated to the SVP Sales (or VP Sales where they hold a Country level responsibility). In the event that the interpretation or dispute is not resolved at this level there should be further escalation to the Regional Chief Operating Officer. If a participant wishes to dispute a decision then they may raise this in writing to the Head of HR for the region. Their decision will be final.

Following this provision, on August 16, 2009, Milks sent an email to Paul Orme-Smith, senior vice president of Software AG's North America region, and McDonald with an attached letter notifying Software AG of the deficient commission payment.

On August 24, 2009, Software AG emailed to Milks a revised Appendix A, which changed his quota amounts and commission percentages. Software AG applied the revised formula to all of Milks's work in 2009, including the deal and his second quarter bonus. Thus, Software AG claimed that the $130,947 payment was the correct amount, as it was based on the revised plan.

Software AG contends that the revision of Appendix A of the plan was permissible because under the plan, it has absolute discretion to (1) vary the terms of the plan, (2) vary an employee's quota, (3) determine the amount of commission payable, and (4) provide a binding decision as to any commission dispute. In support of its position, Software AG points to several provisions of the plan, specifically paragraphs 10[2] and 12[3] and the

---

[2] Paragraph 10, entitled "Circumstances not defined in the Plan," states that

In the event that a situation occurs, or may occur, that is not clearly defined in the Plan, then the relevant SVP will determine any commissions to be paid in their absolute discretion. It is the responsibility of the sales

paragraphs in Appendix B entitled "Adjustment to Payments"[4] and "Interpretations and Disputes."

According to Software AG, commissions are not calculated and processed until the month following the close of a deal, and incentive payments above €50,000 (such as Milks's payment) require executive review and approval. When calculating Milks's second quarter commissions in July 2009, Software AG contends that it realized that it needed to adjust Milks's quota in light of his minimal role in the deal.[5]

---

person to bring any such situations to the attention of their SVP at the earliest opportunity.

[3] Paragraph 12, entitled "Management Reservations," states that

The Company [Software AG] has the right to vary the terms of the Plan, and to replace, withdraw or suspend the Plan at any time in its absolute discretion. Any such action will be notified to the Participants as soon as is reasonably practicable. This provision will be operated subject to any relevant laws in force in the county or jurisdiction in which the Participant works.

[4] Appendix B, in the paragraph entitled "Adjustments to Payments," states that

If the company pays a participant a commission based on performance which subsequently has to be recalculated in accordance with the rules of the governing scheme and this alters the amount of commission the participant actually should have been paid the Company will recalculate said commission. This may increase or decrease the payment which is due to the participant.

[5] Software AG avers that the deal, which closed in June 2009, was the culmination of four years of work and that Milks did not join until March 2009 (when the projected value of the deal was $2.5 million) and had a negligible role in the deal.

Thus, even though the deal closed in excess of $5.5 million, Software AG adjusted Milks's quota to a level commensurate with the revised target of $2.5 million, which it alleges was the deal's potential value in March 2009, when Milks was hired.

In response, Milks asserts that paragraph 5.6 clearly provides an exception to Software AG's right to change the plan. Paragraph 5.6, entitled "Large Deal Exception & Bluebird Opportunities," states that

> Where a deal provides present value license revenues in excess of One and a half million Euros (€1.5m) or the local currency equivalent using the relevant [Year] Plan rates, the Company reserves the right to only award the sales person with partial quota recognition for the deal. The value of quota recognition awarded to be decided, in advance of the deal closing and documented in writing, by the relevant SVP.

> Where a sales person has been provided with a 'Bluebird' opportunity, defined as an opportunity for which they have had little or no direct involvement, the company reserves the right to only award the sales person with partial quota recognition for the deal. The value of quota recognition awarded to be decided, in advance of the deal closing and documented in writing, by the relevant SVP.

Milks avers that this paragraph applies because the deal qualified as a large deal or bluebird opportunity, and consequently, Software AG was required, but failed, to give him prior written notice of his commission reduction

---

Milks contends that McDonald's email makes no mention of his lack of involvement when answering Milks's question of how his commission would be calculated.

before the close of the deal. Milks thus concludes that Software AG did not comply with this paragraph when it unilaterally modified the terms of his compensation after the deal had closed and his entitlement to $226,966 in commissions had accrued.

On or about September 14, 2009, Milks resigned from Software AG because Software AG had failed to pay him the correct amount and failed to resolve the dispute in his favor.

On December 17, 2009, Milks filed this suit against Software AG in the Superior Court of Gwinnett County, asserting claims for breach of contract, actual fraud and constructive fraud. Milks also sought punitive damages and attorneys' fees because Software AG's alleged conduct was willful and in bad faith.

On January 27, 2010, Software AG removed the action to this Court. On February 3, 2010, it filed a motion to dismiss Milks's complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Software AG contends that Milks's breach of contract claim fails because it had the absolute discretion to modify the terms of the plan at any time and that the head of HR's decision is final and binding on Milks.

Thus, Software AG avers that its revision of Milks's compensation did not breach the plan's terms.

Software AG further contends that Milks's actual and constructive fraud claims fail because (1) it did not breach an additional independent duty imposed by law; (2) the plan's merger clause bars his fraud claims; (3) Milks fails to plead facts with the particularity required by Fed. R. Civ. P. 9(b); (4) it did not make any false representations to Milks; and (5) Milks's belief or reliance that his compensation could not be altered at its discretion was not reasonable.

## II.   Legal Standard

Pursuant to Fed. R. of Civ. P. 12(b)(6), a pleading must be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To survive a motion to dismiss, the factual allegations in the pleading "must be enough to raise a right to relief above the speculative level" and cannot be "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

The allegations in Plaintiffs' complaint are presumed to be true at this stage, and all reasonable factual interferences must be construed in its

favor. *Id.*; *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994). However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *accord Lewis v. Brautigam*, 227 F.2d 124, 127 (5th Cir. 1955).[6]

## III. Analysis

### A. Breach of Contract Claim

Milks alleges that Software AG breached the plan when it failed to comply with paragraph 5.6, which he contends is an explicit exception to paragraphs 10 and 12. Thus, Milks concludes that paragraphs 10 and 12 are inapplicable. Milks further avers that even if paragraphs 10 and 12 applied, they are ambiguous and must be construed against Software AG.

Software AG contends that Milks's breach of contract claim fails as a matter of law because its adjustment to Milks's quota is expressly authorized by the plan, as is its right to make a final decision concerning a dispute arising under the plan. It further asserts that the plan is unambiguous, paragraph 12 does not conflict with or render meaningless

---

[6] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

paragraph 5.6, and Appendix B's "Interpretations and Disputes" paragraph provides the exclusive process for resolving disputes under the plan.

### 1. Interpretation of Paragraphs 5.6, 10 and 12

The Court first determines whether paragraph 5.6 is an explicit exception to paragraph 12 and whether paragraphs 10[7] and 12 render the plan ambiguous.

"The construction of a contract is a question of law for the court." *Nationwide Mut. Fire Ins. Co. v. Somers*, 264 Ga. App. 421, 423-24, 591 S.E.2d 430, 433 (2003) (quoting O.C.G.A. § 13-2-1). "Where the terms are clear and unambiguous, and capable of only one reasonable interpretation, the court is to look to the contract alone to ascertain the parties' intent." *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 269 Ga. 326, 328, 498 S.E.2d 492, 494; *see also Ryan v. State Farm Mut. Auto. Ins. Co.*, 261 Ga. 869, 872, 413 S.E.2d 705, 707 (1992) ("If the terms of the contract are plain and unambiguous, the contract must be enforced as written, so long as it is within the prescribed bounds of the law.").

---

[7] Software AG appears to argue that paragraph 10 supports its revision of Milks's commission in the event that paragraph 12 does not. As the Court determines, *infra*, that paragraph 12 does apply, the Court does not address the validity or applicability of paragraph 10.

When determining the parties' intent, "[t]he contract is to be considered as a whole and each provision is to be given effect and interpreted so as to harmonize with the others." *Boardman Petroleum, Inc.*, 269 Ga. at 328, 498 S.E.2d at 494. The Court must give words in the contract their "usual, ordinary, and common meaning." *Bold Corp., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 216 Ga. App. 382, 383, 454 S.E.2d 582, 584 (1995) (citing O.C.G.A. § 13-2-2(2)). "Dictionaries may supply the plain and ordinary sense of a word." *Mkt. Place Shopping Ctr. v. Basic Bus. Alternatives, Inc.*, 213 Ga. App. 722, 722, 445 S.E.2d 824, 826 (1994).

Milks argues that paragraph 5.6 is an explicit exception to Software AG's discretion to change the terms of the plan. The Court disagrees. Looking at the plan, the Court finds that paragraph 5.6 is not an explicit exception to paragraph 12. The plain language of paragraph 12 states that Software AG has "the right to vary the terms of the Plan, and to replace, withdraw or suspend the Plan at any time in its absolute discretion." This does not suggest or support Milks's contention that Software AG intended paragraph 5.6 to be an exception to paragraph 12. Paragraph 5.6 is also devoid of language supporting Milks's assertion that it is an exception to paragraph 12. *Cf. McLean v. Cont'l Wingate Co.*, 212 Ga. App. 356, 358-59,

442 S.E.2d 276, 278-79 (1994) (enforcing an agreement in which the terms specifically excluded the use of operating expenses in the calculation of profits). The Court will not read into the plan an exception not provided specifically for by the language of the plan.[8]

Milks also argues that Software AG's suggested interpretation of paragraphs 10 and 12 create a conflict with paragraph 5.6 and hence an ambiguity in the contract. He urges the Court to construe the plan against Software AG, the drafter, and resolve the ambiguity by finding that paragraph 5.6 is an exception to Software AG's discretion.

Software AG responds that paragraph 12 does not render paragraph 5.6 meaningless; rather, it operates to supersede paragraph 5.6 in limited circumstances. It contends that paragraph 12 is a "a fail-safe mechanism affording the Company with the right to take the actions necessary to fulfill the Plan's articulated goals 'to motivate, and to fairly compensate the Company's sales staff.'"

---

[8] Furthermore, even if paragraph 5.6 controlled, it does not apply automatically. Milks asserts that Software AG was "unambiguously *required* to decide on the amount of any reduced commission and give [him] notice of the commission amount 'in advance of the deal closing and documented in writing.'" However, for both large deals and bluebird opportunities, paragraph 5.6 states that Software AG "reserves the right to only award the sales person with partial quota recognition for the deal." This language does not support Milks's assertion that Software AG was required to follow this paragraph for all large deals or bluebird opportunities. In addition, Milks has not pled facts showing that Software AG did exercise its rights under this provision.

The Court rejects Milks's argument that the contract is ambiguous because of an alleged conflict between provisions. "Ambiguity exists where the words used in the contract leave the intent of the parties in question." *Capitol Color Printing, Inc. v. Ahern*, 291 Ga. App. 101, 106, 661 S.E.2d 578, 583 (2008). The words used in the plan do not leave the intent of the parties in question. For large deals and bluebird opportunities, Software AG may award partial quota pursuant to paragraph 5.6 and will give advance notice in writing if it exercises its right under this provision.

In paragraph 12, Software AG reserves the right to vary the terms of the plan, which includes paragraph 5.6. Thus, when determining Milks's commission, Software AG could pay him a commission pursuant to (1) Appendix A, (2) paragraph 5.6 or (3) paragraph 12. In this case, Software AG opted to exercise the rights provided by paragraph 12. These options are clearly provided for in the plan, and examining the plan "as a whole and affording the words therein their plain and ordinary meaning, the [plan] is capable of only one reasonable interpretation." *Id.* Consequently, no ambiguity exists. *Id.*

By contrast, Milks's interpretation would require the Court to render paragraphs 10 and 12 meaningless and negate Software AG's intent when it

entered into the plan. That would exceed the scope of the Court's purpose. *See Michna v. Blue Cross & Blue Shield of Ga., Inc.*, 288 Ga. App. 112, 113, 653 S.E.2d 377, 379 (2007) ("It is the function of the court to construe the contract as written and not to make a new contract for the parties."). While Milks may find Software AG's exercise of the rights reserved in paragraph 12 unfair where, as here, it chooses to reduce his commission,[9] parties "are free to choose, insert, and agree to whatever provisions they desire in a contract . . . unless prohibited by statute or public policy." *Id.* at 114, 653 S.E.2d at 380. Milks has not pointed to any statute or public policy that requires the Court to adopt his interpretation of the plan.

### 2. Revision of Commission Formula

Having determined that paragraph 5.6 is not an explicit exception to paragraph 12 and that paragraphs 10 and 12 do not render the plan ambiguous, the Court now addresses whether Software AG breached the plan when it revised Milks's commission formula in July 2009.

"Where an agreement gives a party discretionary decision-making authority . . . the sole question for a court in reviewing whether the agreement has been breached is whether the decision was made in good

---

[9] It also appears that Milks's 25% second-quarter bonus was not explicitly provided for in the plan. He, however, does not challenge this revision.

faith and involved the exercise of honest judgment." *Planning Techs., Inc. v. Korman*, 290 Ga. App. 715, 718, 660 S.E.2d 39, 42 (2008). *See also State Hwy. Dep't v. MacDougald Constr. Co.*, 189 Ga. 490, 502, 6 S.E.2d 570, 577(1939) (holding that the decision of the person vested with discretionary decisionmaking authority is binding on the parties where he does not exceed his authority and his decision does not imply bad faith or failure to exercise honest judgment). However, "if an agreement by its express terms grants a party absolute or uncontrolled discretion in making a decision, then no duty of good faith is implied as to that decision and there can be no breach of the agreement predicated on the decision." *Korman*, 290 Ga. App. at 718, 660 S.E.2d at 42. *See also Automatic Sprinkler Corp. of Am.*, 243 Ga. 867, 868, 257 S.E.2d 283, 284 (1979) ("[I]t is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant.").

Software AG avers that paragraph 12 falls into the latter category. Paragraph 12 provides that Software AG can vary the terms of the Plan "at any time in its absolute discretion." This is similar to the language in *Automatic Sprinkler* that the Georgia Supreme Court found vested the

employer with absolute discretion when determining employee commissions, making good faith irrelevant. In *Automatic Sprinkler*, 243 Ga. at 867, 257 S.E.2d at 284, the employer's compensation plan stated that "[t]he award of any direct incentive is entirely within the discretion of the corporation." The Georgia Supreme Court found that the employee had no vested right to payment of any deferred incentive compensation for work already completed as his employer had an absolute right to award or not award any such compensation. *Id.* at 869, 257 S.E.2d at 285. Thus, Software AG argues that under *Automatic Sprinkler*, it did not breach the plan when it changed Milks's commission because it had absolute discretion to do so.

In response, Milks argues that paragraph 12 requires Software AG to comply with the laws of Georgia and under Georgia law, Software AG cannot change compensation already accrued and owed under the original plan. He also asserts that *Automatic Sprinkler* and the other cases Software AG relies on are distinguishable and inapplicable.

Paragraph 12 states that it "will be operated subject to any relevant laws in force in the country or jurisdiction in which the Participant works." Milks avers that Georgia law does not allow Software AG to change

compensation already accrued and owed under the plan. The cases cited by Milks in support of this proposition, however, do not address commission contracts that vest the employer with discretion to vary the plan, even after work has been performed. *See Cox v. Erwin*, 246 Ga. App. 439, 440, 541 S.E.2d 69, 70 (2000) (addressing independent contractor's oral agreement with the defendant regarding alleged commissions owed); *Foreman v. E. Foods, Inc.*, 195 Ga. App. 332, 334, 393 S.E.2d 695, 698 (1990) (allowing employee's bonus claim which was based on an oral agreement with the employer). Moreover, the cases addressing an employer's discretion to change commission payments do not turn on whether the commission was earned for work already earned. *See Automatic Sprinkler*, 243 Ga. at 868-69, 257 S.E.2d at 284-85 (upholding the employer's rejection of the employee's request for incentive compensation earned on sales "he undisputedly made before his departure from the company."); *Jones v. Vulcan Materials Co.*, 112 Ga. App. 402, (1965) (finding that under the terms of the plan vesting the employer with discretion "no employee, even though eligible for an award [as a result of past work performed], is entitled as a matter of right to have an award made to him, or, if made, that it be made for any particular sum").

Milks seeks to distinguish *Automatic Sprinkler* and similar cases on the bases of the location of the discretionary provision and explicitness of paragraph 12. As for location, Milks argues that *Automatic Sprinkler* and other cases like it do not apply because in those cases the discretionary provision was a part of the bonus calculation language, whereas paragraph 12 is not included in Appendix A, which details Milks's commission rates. The Court finds this distinction without merit. As for explicitness, Milks contends that paragraph 12 does not explicitly give Software AG the discretion to alter the commission formula after his entitlement to commission has accrued. The Court finds this argument unpersuasive. The discretionary provisions upheld in *Automatic Sprinkler* and similar cases do not explicitly state that commission can be altered after entitlement has arisen. Consequently, such explicit language is not a requirement under Georgia law.

Having rejected Milks's arguments in opposition to Software AG's interpretation of paragraph 12, the Court now determines whether the plan vests Software AG with absolute discretion, making good faith irrelevant. As stated above, paragraph 12 gives Software AG the right to vary the plan "at any time in its absolute discretion." This supports the conclusion that

good faith is irrelevant. However, Appendix B's "Interpretations and Disputes" paragraph states that the decision of the head of human resources for the region regarding plan disputes "will be final." This supports the conclusion that good faith is relevant. *See Korman*, 290 Ga. App. at 719, 660 S.E.2d at 43 ("The provisions refer to the decisions of the Board as binding, final, and conclusive—language which in previous cases we have held is not absolute and subjects the decision-making party to the standard of good faith and honest judgment.").

When interpreting a contract, the Court is charged with looking at the contract as a whole. Thus, the Court finds that Appendix B imposes a good faith requirement on Software AG's discretion to vary the terms of the plan. This, however, does not change the outcome of the case. When evaluating for good faith, the Court will not interfere with Software AG's decision even if its revision was erroneous or unreasonable. Its decision must be "fraudulent in fact, or so palpably erroneous or unreasonable as to be self-impeaching, in view of the terms of the contract and the circumstances" before the Court will disregard it. *State Hwy.*, 189 Ga. at 502, 6 S.E.2d at 577. Milks does not allege that Software AG's revision, if allowed, was made in bad faith. Rather, he contends that the revision was not allowed. Based

on the facts before it, the Court cannot conclude that Software AG's revision of Milks's commission was so palpably erroneous or unreasonable in view of the plan and the circumstances. Furthermore, McDonald's email detailing a commission based on a $5 million deal cannot create an entitlement to commission when there was none. *Jones*, 112 Ga. App. at 402, 145 S.E.2d at 272. Consequently, the Court finds that Software AG had the right to change the terms of the plan and there is no evidence that it abused that discretion. Milks fails to state a claim for breach of contract.

## IV. Fraud Claims

Milks also pleads claims for actual and constructive fraud. To establish fraud, Milks "must show that [he] reasonably relied upon a false representation made with scienter by a defendant who intended to induce the plaintiff to act or refrain from acting, resulting in damage to the plaintiff." *Worker's Comp. Legal Clinic of La. V. BellSouth Telecomm., Inc.*, 374 F. Supp. 2d 1215, 1218 (N.D. Ga. 2005) (citing *Crawford v. Williams*, 258 Ga. 806, 808, 375 S.E.2d 223 (1989).

In support of his actual fraud claim, Milks alleges that Software AG falsely represented that his compensation for the deal would be based on the plan and that it knew at the time it entered into the plan with him that it

would not compensate him according to the terms of the plan. Thus, he concludes that Software AG fraudulently induced him to work for it. In support of his constructive fraud claim, Milks relies on McDonald's email stating what his commission would be if the deal closed with a $5 million value. The Court rejects both of Milks's fraud claims.

First, Milks does not allege sufficient facts to support his fraud claims. "Any breach of contract must arise from the contract, and does not give rise to an action for tort, whether or not such breach was negligent or willful." *A.I. Williams & Assoc. v. Faircloth*, 259 Ga. 767, 769, 386 S.E.2d 151, 154 (1989). *See also ServiceMaster Co. v. Martin*, 252 Ga. App. 751, 754, 556 S.E.2d 517, 522 (2001) ("It is well settled that mere failure to perform a contract does not constitute a tort."). "A plaintiff in a breach of contract case has a tort claim only where, in addition to breaching the contract, the defendant also breaches an independent duty imposed by law." *ServiceMaster*, 252 Ga. App. at 754, 556 S.E.2d at 522. Milks's complaint and the plan show that all of the duties which he contends Software AG breached arise directly from, not independent of, the plan. *Id.* Thus, his allegations in his fraud claims "cannot serve to convert a claim in contract into a discrete claim in tort. They add nothing of substance to the breach of

contract claim of count one, and are mere surplusage to it." *Id.* Consequently, Milks's fraud claims should be dismissed.

The plan's merger clause also requires dismissal of Milks's fraud claims. At the beginning of the plan, the merger clause states that "[t]ogether these documents[10] form the entire agreement relating to the RSM Commission Plan 2009 and supersede all previous versions or any other representations or understandings relating to the subject matter of these documents."

"Where a contract has a merger clause, the parties may no longer reasonably rely on representations made outside the contract." *Worker's Comp.*, 374 F. Supp.2d at 1219. The clause "operates as a disclaimer, establishing that the written contract completely and comprehensively represents all of the parties' agreement and thus bar plaintiffs from asserting reliance on the alleged misrepresentation not contained within the contract." *Id. See also Megel v. Donaldson*, 288 Ga. App. 510, 515, 654 S.E.2d 656, 661 (2007) ("In essence, a merger clause operates as a disclaimer of all representations not made on the face of the contract.").

---

[10] This is referring to the three documents listed above that comprise the plan: the terms and conditions, Appendix A and Appendix B.

Furthermore, where a party elects to affirm a contract with a merger clause, it is relegated to recovery in contract, and the merger clause will prevent its recovery in an action for fraud. *Id.* *Accord Wireless MD, Inc. v. Healthcare.com Corp.*, 271 Ga. App. 461, 469, 610 S.E.2d 352, 359 (2005). By asserting and maintaining a separate action for breach of contract, Milks has affirmed the plan and thereby waived any right to rescind it. *Worker's Comp.*, 374 F. Supp. 2d at 1221. Thus, Milks could not reasonably rely on representations made outside the plan, and his fraud claims cannot survive unless he can show misrepresentations by Software AG regarding his commission that are actually contained in the plan. *WirelessMD*, 271 Ga. App. at 469, 610 S.E.2d at 359. The Court has already determined that the plan explicitly allowed Software AG to change Milks's commission after the deal was closed. Therefore, Milks cannot show that the plan contains a false representation by Software AG the plan could not or would not be changed. *Id.* Accordingly, Milks's fraud claims must be dismissed.

## V.    Conclusion

The Court hereby GRANTS Defendant Software AG USA, Inc.'s motion to dismiss [3]. Plaintiff's complaint is DISMISSED WITH PREJUDICE. The Clerk is DIRECTED to close the case.

IT IS SO ORDERED this 13th day of April, 2010.

Timothy C. Batten, Sr.
United States District Judge